**Nos. 24-12290DD, 24-12391DD**

---

# United States Court of Appeals
**FOR THE ELEVENTH CIRCUIT**

---

**STEVEN R. DEWITT,**
Plaintiff - Appellant,

**v.**

**APALACHEE CI WARDEN,**
Defendant - Appellee.

---

**Appeal from the United States District Court for the Northern District of Florida**

---

**OPENING BRIEF OF APPELLANT STEVEN R. DEWITT**

Erica Hashimoto
*Director*
GEORGETOWN UNIVERSITY LAW CENTER
APPELLATE LITIGATION PROGRAM
111 F Street NW, Suite 306
Washington, D.C. 20001
(202) 662-9555
eh502@georgetown.edu
*Counsel for Appellant*

Mar. 2, 2026

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Counsel for Plaintiff-Appellant Steven DeWitt certifies that the following persons and entities may have an interest in the outcome of this case:

- Apalachee Correctional Institution;
- Belitzky, Joe, Former Counsel for Appellee;
- DeWitt, Steven, Appellant;
- Fitzpatrick, Martin A., United States Magistrate Judge;
- Florida Department of Corrections;
- Florida Northwest Reception Center;
- Hashimoto, Erica, Counsel for Appellant;
- Kverne, Erik, Counsel for Appellee;
- Liberty Correctional Institution;
- Maddox, David, Appellee;
- Moody, Ashley, Former Florida Attorney General;
- Sharma, Ravi, Former Counsel for Appellee;
- Uthmeier, James, Florida Attorney General;
- Villalpando, Juanita, Trial Counsel for Appellee; and

- Walker, Mark, United States District Judge.

Counsel for Plaintiff-Appellant Steven DeWitt further certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

This Court has classed this civil appeal for oral argument, as noted in its September 19, 2025 letter to appointed counsel. Plaintiff-Appellant Steven DeWitt respectfully requests oral argument because this case presents important questions, including regarding appointment of counsel for a blind, pro se litigant in a complex trial. Oral argument would assist the Court in answering these questions, which will have significant implications for Mr. DeWitt and similarly situated plaintiffs.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ C-1

STATEMENT REGARDING ORAL ARGUMENT ........ i

TABLE OF CONTENTS ........ ii

TABLE OF CITATIONS ........ v

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

I. PROCEDURAL HISTORY ........ 3

A. Pretrial Proceedings ........ 3

*1. Pleadings* ........ 3

*2. Motion to Appoint Counsel* ........ 3

*3. Exhibit and Witness Lists* ........ 4

*4. Motion to Disqualify Judge Walker* ........ 8

B. Trial and Verdict ........ 9

C. Post-Trial Proceedings ........ 10

II. STATEMENT OF THE FACTS ........ 11

A. Mr. DeWitt's Case-in-Chief ........ 11

B. Warden Maddox's Defense ........ 18

C. Mr. DeWitt's Difficulties with His Vision During Trial ........ 21

SUMMARY OF THE ARGUMENT ........ 24

ARGUMENT ........ 27

I. THE DISTRICT COURT ERRED BY DENYING APPOINTED COUNSEL. ........ 27

A. Mr. DeWitt's Blindness and the Complexities of His Case Constituted Exceptional Circumstances. ..................... 27

*1. Mr. DeWitt's Blindness and Lack of Representation Prevented Him from Adequately Presenting His Case.* ..................................... 28

*2. Mr. DeWitt's Blindness and Lack of Counsel Prevented Him from Adequately Investigating His Case.* ..................................................................... 30

*3. Mr. DeWitt's Case Required Skilled Representation Beyond His Capabilities.* .......................... 32

*4. Mr. DeWitt's Case Was Legally and Factually Complex.* ....................................................................... 34

*5. Appointment of Counsel Would Have Sharpened the Issues and Promoted a Just Determination.* ................................................................. 36

B. The District Court's Rulings Denying Counsel Fell Short. .......................................................................... 38

II. THE EXCLUSION OF KEY WITNESSES AND EVIDENCE WAS IMPROPER. ............................................................................ 40

A. Mr. Beavers' Testimony Was Highly Relevant, and the District Court Abused its Discretion by Excluding Him. ................................................................ 40

B. Officer House's Testimony Would Have Restored Mr. DeWitt's Credibility. .......................................................... 45

C. Rejecting Mr. DeWitt's Attempt to Call Ms. Ottinger Was Improper. ............................................................ 49

D. The Peterson Memorandum and Yates Request Were Admissible. ............................................................ 51

III. THE COURT MISHANDLED MR. DEWITT'S DISQUALIFICATION MOTION. ............................................................................ 56

A. Mr. DeWitt Was Entitled to an Evidentiary Hearing. ......... 56

B. Judge Walker Abused His Discretion When He Conducted Independent Investigations into Mr. DeWitt's Case. .......... 60

CONCLUSION .......... 63

CERTIFICATE OF COMPLIANCE .......... 64

CERTIFICATE OF SERVICE .......... 65

# TABLE OF CITATIONS

## Cases

*Abdullah v. Gunter*,
949 F.2d 1032 (8th Cir. 1991) .......... 35, 37

*Broadwater v. United States*,
292 F.3d 1302 (11th Cir. 2002) .......... 42

*Cardwell v. Warden, FCI Talladega*,
748 F.3d 1090 (11th Cir. 2014) .......... 43

*Castro v. United States*,
540 U.S. 375 (2003) .......... 50

*Christo v. Padgett*,
223 F.3d 1324 (11th Cir. 2000) .......... 58

*Clemons v. Comm'r, Ala. Dep't of Corr.*,
967 F.3d 1231 (11th Cir. 2020) .......... 46

*DeJesus v. Lewis*,
14 F.4th 1182 (11th Cir. 2021) .......... 28, 30, 33, 34

*DeWitt v. Florida*,
No. 4:15-cv-00433 (N.D. Fla.) .......... 47, 58, 59

*EEOC v. Troy State Univ.*,
693 F.2d 1353 (11th Cir. 1982) .......... 46

*Farmer v. Brennan*,
511 U.S. 825 (1977) .......... 43

*Furcron v. Mail Ctrs. Plus, LLC*,
843 F.3d 1295 (11th Cir. 2016) .......... 43

*Goulah v. Ford Motor Co.*,
118 F.3d 1478 (11th Cir. 1997) .......... 47

*Hall v. Merola*,
67 F.4th 1282 (11th Cir. 2023) .......... 35

*Henderson v. Ghosh*,
755 F.3d 559 (7th Cir. 2014) .......... 31

*Jackson v. Dallas Police Dep't*,
811 F.2d 260 (5th Cir. 1986) .......... 39

*Josendis v. Wall to Wall Residence Repairs, Inc.*,
662 F.3d 1292 (11th Cir. 2011) .......... 45

*Kilgo v. Ricks*,
983 F.2d 189 (11th Cir. 1993) .......... 27, 33

*Kotteakos v. United States*,
328 U.S. 750 (1946) .......... 44

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) .......... 57

*Liteky v. United States*,
510 U.S. 540 (1994) .......... 58

*Maclin v. Freake*,
650 F.2d 885 (7th Cir. 1981) .......... 34

*Mawby v. United States*,
999 F.2d 1252 (8th Cir. 1993) .......... 51

*McCarthy v. Weinberg*,
753 F.2d 836 (10th Cir. 1985) .......... 36

*McWhorter v. City of Birmingham*,
906 F.2d 674 (11th Cir. 1990) .......... 56

*Merritt v. Faulkner*,
697 F.2d 761 (7th Cir. 1983) .......... passim

*Meyers v. Pennypack Woods Home Ownership Assn.*,
559 F.2d 894 (3d Cir. 1977) .......... 48

*Naranjo v. Thompson*,
809 F.3d 793 (5th Cir. 2015) .......... 30, 36

*Neal v. Cassiday*,
511 F. App'x 865 (11th Cir. 2013) .......... 29, 38

*Norris v. United States*,
820 F.3d 1261 (11th Cir. 2016) .......... 60

*Offutt v. United States*,
348 U.S. 11 (1954) .......... 57

*Parker v. Connors Steel Co.*,
855 F.2d 1510 (11th Cir. 1988)....................57

*Perez v. Fenoglio*,
792 F.3d 768 (7th Cir. 2015)....................28, 39

*Perry v. State Farm Fire & Cas. Co.*,
734 F.2d 1441 (11th Cir. 1984)....................44

*Poindexter v. F.B.I.*,
737 F.2d 1173 (D.C. Cir. 1984)....................33

*Ricks v. Khan*,
135 F.4th 296 (5th Cir. 2025)....................36, 37

*Romero v. Drummond Co.*,
552 F.3d 1303 (11th Cir. 2008)....................45

*Santiago v. Walls*,
599 F.3d 749 (7th Cir. 2010)....................34

*Seamon v. Remington Arms Co.*,
813 F.3d 983 (11th Cir. 2016)....................41

*Smith v. Fla. Dep't of Corr.*,
713 F.3d 1059 (11th Cir. 2013).................... passim

*Steele v. Shah*,
87 F.3d 1266 (11th Cir. 1996), *as amended* (Sep. 6, 1996) ..........38, 39

*United States v. Alfaro-Moncada*,
607 F.3d 720 (11th Cir. 2010)....................41

*United States v. Bueno-Sierra*,
99 F.3d 375 (11th Cir. 1996)....................52

*United States v. Carey*,
929 F.3d 1092 (9th Cir. 2019)....................61

*United States v. Docampo*,
573 F.3d 1091 (11th Cir. 2009)....................43

*United States v. Elysee*,
993 F.3d 1309 (11th Cir. 2021)....................54

*United States v. Ethridge*,
948 F.2d 1215 (11th Cir. 1991)....................46

*United States v. Frazier*,
387 F.3d 1244 (11th Cir. 2004) (*en banc*) ........................................ 49

*United States v. Johnson*,
877 F.3d 993 (11th Cir. 2017) ........................................................ 42

*United States v. Jordan*,
915 F.2d 622 (11th Cir. 1990) ........................................................ 50

*United States v. Joseph*,
978 F.3d 1251 (11th Cir. 2020) ................................................ 52, 54

*United States v. Madden*,
733 F.3d 1314 (11th Cir. 2013) ................................................ 51, 54

*United States v. Novaton*,
271 F.3d 968 (11th Cir. 2001) ........................................................ 40

*United States v. Rodriguez*,
765 F.2d 1546 (11th Cir. 1985) ...................................................... 48

*United States v. Smith*,
30 F.4th 1334 (11th Cir. 2022) ................................................ 41, 42

*United States v. Starr*,
159 F.4th 901 (11th Cir. 2025) ...................................................... 54

*United States v. Tinoco*,
304 F.3d 1088 (11th Cir. 2002) ...................................................... 40

*United States v. Williams*,
527 F.3d 1235 (11th Cir. 2008) ...................................................... 40

*United States v. Williford*,
764 F.2d 1493 (11th Cir. 1985) ...................................................... 55

**Statutes**

28 U.S.C. § 1291 ........................................................................ 1

28 U.S.C. § 1331 ........................................................................ 1

28 U.S.C. § 455 ................................................................. passim

42 U.S.C. § 1983 .................................................................... 1, 3

**Rules**

Am. Bar Ass'n Model Code of Jud. Conduct R. 2.9 ......................... 60, 62

Fed. R. App. P. 4 .......... 1
Fed. R. Civ. P. 59 .......... 1
Fed. R. Evid. 803 .......... 52
Fed. R. Evid. 804 .......... 53
N.D. Fla. Loc. R. 7.1 .......... 41

**Other Authorities**

*Institutions*,
Fla. Dep't of Corr., https://www.fdc.myflorida.com/institutions [https://perma.cc/894Q-Y5FH] .......... 13

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had subject matter jurisdiction because Plaintiff-Appellant Steven DeWitt sought relief under 42 U.S.C. § 1983. 28 U.S.C. § 1331. Following trial, the jury returned its verdict on June 13, 2024, finding in favor of Defendant-Appellee David Maddox. Doc. 188. This Court has appellate jurisdiction because Mr. DeWitt appeals from a final judgment of the district court. 28 U.S.C. § 1291.

Mr. DeWitt timely moved for a new trial under Federal Rule of Civil Procedure 59, Doc. 191, and the district court denied the motion on June 28, 2024, Doc. 195. Mr. DeWitt filed a timely notice of appeal on July 15, 2024. Doc. 197; *see* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

Mr. DeWitt, a blind litigant, had to proceed pro se in a complex jury trial involving critical disputes both about documents that proved his claims and about witnesses and evidence in the trial. The issues are:

1. Whether the district court abused its discretion by refusing to appoint counsel despite Mr. DeWitt's blindness and the complexity of his case, including disputes over documents he could not see, voluminous discovery, and overlapping constitutional claims.

2. Whether the district court abused its discretion when it denied Mr. DeWitt's motion for a new trial and prevented Mr. DeWitt from calling crucial lay and expert witnesses on procedural and relevance grounds; and whether it plainly erred by excluding two business records going to the heart of Mr. DeWitt's claims.

3. Whether the district court abused its discretion by not conducting an evidentiary hearing into whether an objective observer might perceive judicial bias and by instead independently researching Mr. DeWitt's previous litigation history.

# STATEMENT OF THE CASE

## I. Procedural History

### A. Pretrial Proceedings

#### *1. Pleadings*

Steven DeWitt filed a Section 1983 complaint against David Maddox, Warden of the Northwest Florida Reception Center ("Northwest"), alleging Eighth and First Amendment violations. Doc. 5 at 9.[1] Mr. DeWitt claimed that Warden Maddox deliberately failed to protect him from a foreseeable assault during his April 5, 2018 prison transfer from Northwest to Apalachee Correctional Institution ("Apalachee"). *Id.* at 8. He also alleged that Warden Maddox threatened to relocate him away from his family if he filed grievances. *Id.* at 7.

Warden Maddox moved for summary judgment on both claims. Doc. 19. The district court denied the motion and set the case for trial. Docs. 24; 25.

#### *2. Motion to Appoint Counsel*

Mr. DeWitt moved for appointment of counsel during discovery. Doc. 69. He requested counsel's assistance because he could not see or

[1] ECF-labeled pagination is referenced throughout this brief.

read documents needed for trial. *Id.* at 1. Mr. DeWitt provided medical documentation showing that he is legally blind in both eyes due to severe long-term, end-stage glaucoma. *Id.* at 4, 6. He explained that his vision impairment would impede and delay the trial, as well as embarrass and disadvantage him in front of the jury. *Id.* at 1.

The court denied Mr. DeWitt's motion. Doc. 71 at 2. Its single-paragraph analysis stated that Mr. DeWitt "has been sufficiently able to represent himself throughout this litigation, and his condition has existed since at least September of 2021." *Id.*

Two months later, Mr. DeWitt renewed his request, asking for appointment of standby counsel at least to help him present his own testimony to the jury. Doc. 240 at 12. The court rejected this request. *Id.* at 13-14. It noted that Mr. DeWitt's "awkward" presentation of testimony did not constitute exceptional circumstances, and there was no "pool of lawyers for the Court to appoint folks from." *Id.* at 13.

*3. Exhibit and Witness Lists*

Mr. DeWitt filed multiple exhibit lists leading up to trial. Docs. 64; 67; 70; 90. The court held that his Second Amended Pre-Trial Exhibit List was the operative list. Docs. 83; 110 at 2. The defense sought to

strike several of Mr. DeWitt's exhibits on authenticity and admissibility grounds, Docs. 96; 170, including:

- A memorandum authored by Cynthia Peterson, a Florida Department of Corrections ("FDC") employee ("Peterson Memorandum"). Docs. 170 at 5-8; 170-1 at 3. The memorandum confirmed Mr. DeWitt's "allegation of being threatened by inmates referenced" in his informal grievance prior to his April 5 transfer, recommended Mr. DeWitt for placement in a "one-person protective section" during transfer, and stated that Ms. Peterson "provided a copy" of Mr. DeWitt's informal grievance to Warden Maddox. Doc. 170-1 at 3.
- An "Urgent Notice" memorandum authored by Warden Maddox ("Maddox Memorandum"), advising that Mr. DeWitt "is not to be placed under . . . protection movement during transfer on 4/5/18." Docs. 170 at 8-9; 170-5 at 3.
- An inmate request form signed by Robert House ("House Form"). Docs. 96 at 5; 170 at 15-18. Officer House was an FDC sergeant at the Liberty Correctional Institution ("Liberty"), where Mr. DeWitt was held before his transfer to Northwest. Doc. 229 at 101-02.

Officer House witnessed "'other inmates' make threats against [Mr. DeWitt] (that they are going to kill [him] when they catch [him])" while at Liberty. Doc. 170-9 at 3.

- A Request for Administrative Remedy signed by Officer Yates ("Yates Request"). Docs. 96 at 5; 170 at 21-23. Officer Yates, who worked at Northwest, confirmed that Mr. DeWitt had been threatened by inmates there. Doc. 170-13 at 9.

The court denied the motions regarding the Peterson and Maddox Memoranda because Mr. DeWitt had established sufficient foundation to authenticate them. Doc. 180. But it affirmed an earlier ruling striking the House Form and Yates Request as inadmissible hearsay. Docs. 110 at 2; 114 at 5; 180 at 1.

Mr. DeWitt also filed several witness lists before trial. Docs. 64; 67; 79. The court held that his Second Amended Witness List, Doc. 79, was the operative list. Doc. 83 at 5. Mr. DeWitt's initial lists named multiple witnesses who were not on his final list, including Officers House and Yates. *Compare* Docs. 64 at 8 *and* 67 at 7, *with* Doc. 79. Officers House and Yates would have testified that Mr. DeWitt was threatened by other inmates. Docs. 64 at 8; 67 at 7.

The defense moved to strike several of Mr. DeWitt's witnesses. Doc. 81. These included Sharon Ottinger, Mr. DeWitt's proffered handwriting expert. *Id.* at 5-6. The court struck Ms. Ottinger without waiting for Mr. DeWitt's response, holding that Mr. DeWitt disclosed her too late and failed to satisfy federal rules governing expert testimony. Doc. 83 at 2-3.

The court also struck Joel Beavers, an FDC Correctional Service Administrator. *Id.* at 3-4. It said that Mr. Beavers was "not relevant to the issue of whether or not the Defendant failed to protect Plaintiff." *Id.* at 4. Mr. DeWitt's witness list described Mr. Beavers as relevant to "the authentication and the redaction of documents found in Plaintiff's [FDC] classification records . . . compared to the original non-redacted document that will be presented as an Exhibit by Plaintiff." Doc. 79 at 2. But the court concluded that the authentication and redaction of classification documents were "of minor relevance . . . and up to this point, there has been no argument presented that relevant records have been altered or redacted." Doc. 83 at 4.

Several months after filing his last witness list, Mr. DeWitt asked the court to subpoena Officer House to corroborate the fact that Mr. DeWitt had previously been threatened while in FDC custody. Doc. 130

at 4. The court denied the request because the deadline for listing witnesses had expired. Doc. 134 at 3-4.

*4. Motion to Disqualify Judge Walker*

Mr. DeWitt moved for Judge Mark E. Walker's disqualification after he discovered that the district judge had previously presided over his state criminal proceedings. Doc. 118 at 4-5. Mr. DeWitt contended that Judge Walker's prior knowledge of him contributed to "his unfair rulings . . . during the pretrial motion hearings." *Id.* at 5.

Judge Walker denied the motion, holding that "[n]o facts have been presented which would cause a 'reasonable observer' to believe that [he] ha[s] a partiality for one side or the other." Doc. 119 at 2. He stated that he had no personal knowledge of the facts of Mr. DeWitt's case, *id.*, and "no memory" of presiding over Mr. DeWitt's cases, *id.* at 4.

Three days later, Judge Walker issued a "clarifying" order. Doc. 120. He said that he had searched state court records and found three cases involving Mr. Dewitt over which he presided. *Id.* at 1. But he concluded that his participation in those cases was not a basis for disqualification. *Id.* at 2.

### B. Trial and Verdict

A more complete description of trial events is included in the Statement of the Facts, so only a procedural summary is presented here. Mr. DeWitt presented his claims at a four-day jury trial from June 10 to 13, 2024. Docs. 229; 230; 231; 232. He called himself, his mother, FDC medical personnel, Sergeant Deante McMillian (a specialist in gang activity), and FDC classification officers to testify. Docs. 229 at 43, 81, 107, 129, 137, 182; 230 at 44, 223. He also offered documents to support his claims, including written correspondence he had with FDC officials demonstrating that he had been threatened by other inmates and Warden Maddox knew of those threats. This included the Maddox Memorandum, in which Warden Maddox ordered that Mr. DeWitt not be protected during his transfer when the attack occurred. Docs. 230 at 54, 71; 187-2 at 10, 63. The district court prevented Mr. DeWitt from presenting the Peterson Memorandum. Doc. 230 at 79.

The defense called Warden Maddox and other FDC officials to testify. It argued to the jury that Mr. DeWitt had altered critical

documents, including the Maddox Memorandum and House Form. Docs. 229 at 166; 230 at 24, 133; 231 at 113-15.

The jury found against Mr. DeWitt on both claims. Doc. 188.

### C. Post-Trial Proceedings

Mr. DeWitt moved for a new trial on June 21, 2024. Doc. 193. He explained that he had just discovered a document demonstrating that he could not have forged the Maddox Memorandum. *Id.* at 3. He also contended that the newly discovered expert opinion from Ms. Ottinger would prove that Mr. DeWitt did not forge the Maddox Memorandum or House Form, and the documents presented at trial were the originals, consistent with the newly discovered document. *Id.* at 3-4. The court denied the motion, stating that Mr. DeWitt was on notice, prior to trial, that the defense would challenge the authenticity of the Maddox Memorandum. Doc. 195 at 2-3. The court also ordered Mr. DeWitt to pay a percentage of Mr. Maddox's costs. Doc. 202 at 4.

Mr. DeWitt appealed the merits judgment on July 15, 2024, and the costs judgment on July 25, 2024. Docs. 197; 206. This Court granted Mr. DeWitt in forma pauperis status and his motion for appointment of counsel.

## II. STATEMENT OF THE FACTS

Mr. DeWitt presented evidence that Warden Maddox violated Mr. DeWitt's Eighth Amendment rights by failing to protect him from a foreseeable assault during his April 5, 2018 transfer from Northwest. Mr. DeWitt also presented evidence that Warden Maddox violated Mr. DeWitt's First Amendment rights by threatening to transfer him away from his family if he filed any more grievances.

### A. Mr. DeWitt's Case-in-Chief

Before Mr. DeWitt's transfer from Northwest to Apalachee during which he was attacked, he was involved in an altercation at another prison with a person who he later learned was a senior gang member. Doc. 230 at 48. After that altercation, an inmate told Mr. DeWitt that gang members were going to kill him. *Id.* at 49. Mr. DeWitt reported that threat to an officer, who put him in a confinement unit. *Id.* Although Mr. DeWitt was originally in a cell by himself, FDC officials placed another person—a gang member—in the same cell with him. *Id.* at 49-50. That person brutally assaulted Mr. DeWitt because Mr. DeWitt had "put [his] hand on a Blood" gang member. *Id.* at 50. He broke Mr.

DeWitt's jaw, dislocated his elbow, fractured his neck, and stabbed his head, leading to a forty-six-day hospitalization. *Id.* at 49-50.

Mr. DeWitt was transferred to Liberty and then notified Officer House of continued threats against him. *Id.* at 51. Officer House signed the House Form on June 22, 2017, confirming that he heard other individuals threatening to kill Mr. DeWitt. *Id.* at 54-55; Doc. 187-2 at 63. Mr. DeWitt testified that because one gang member had a problem with him, he was at risk from all members of that gang. Doc. 230 at 52.[2]

The defense challenged the authenticity of the House Form. *Id.* at 133-36. Defense counsel stated that Mr. DeWitt used white-out to replace a comma with a colon and correct a misspelling of "verify." *Id.* Mr. DeWitt explained that he corrected grammatical and spelling errors but did not alter the substance of the statement. *Id.* at 137. The defense also claimed that Mr. DeWitt modified the House Form after Officer House signed it, adding a sentence in a skipped line of the document. Doc. 232 at 62-63. Mr. DeWitt responded that he would not randomly

[2] Mr. DeWitt referred to this as on sight, a gang term meaning that no matter where he was, gang members would "see him, smash him." *Id.*

skip a line on a form, and that FDC redacted that sentence after Mr. DeWitt submitted it. *Id.* at 94, 98-100.

FDC then transferred Mr. DeWitt from Liberty to Northwest.[3] Doc. 230 at 51; *see* Doc. 187-2 at 34. Members of the same gang continued to threaten Mr. DeWitt once he arrived. Doc. 230 at 52-53. As the death threats escalated, Mr. DeWitt refused to leave his cell. *Id.* at 53.

By March 2018, Warden Maddox approved Mr. DeWitt's transfer from Northwest. Doc. 231 at 102. In a letter written to his mother on March 7, 2018, Mr. DeWitt conveyed his fear of being assaulted and his efforts to be placed in solitary confinement because he felt unsafe in general population. Doc. 230 at 98-99. He explained that he had reported to Northwest staff that gang members threatened to "assault or kill [him] . . . on the transfer bus." *Id.* at 98. One day before Mr. DeWitt's scheduled transfer on April 5, 2018, Mr. DeWitt filed a protective management request, stating: "URGENT: Please Help." *Id.* at 71-73;

[3] Northwest is a transfer facility for people who are being admitted to or transferred between prisons. *See Institutions*, Fla. Dep't of Corr., https://www.fdc.myflorida.com/institutions [https://perma.cc/894Q-Y5FH] (last visited Dec. 14, 2025).

Doc. 187-2 at 8. He indicated that he was in fear for his life. Doc. 230 at 71-72.

Mr. DeWitt testified that he received a response to his protective management request from Ms. Peterson a few hours later. *Id.* at 73. He explained—by reading a letter he sent his mother—that the Peterson Memorandum confirmed that Mr. DeWitt reported receiving threats and FDC authorized Mr. DeWitt for placement in a protective steel cage on the transfer bus. *Id.* at 84. And the Peterson Memorandum communicated that she had forwarded Mr. DeWitt's informal grievance to Warden Maddox that day: April 4, 2018. *Id.* The defense objected to admission of the Peterson Memorandum on hearsay grounds, which the court sustained. *Id.* at 73-79.

Reading from that same letter, Mr. DeWitt explained that Warden Maddox visited him on April 4, 2018. *Id.* at 84. He described:

> Warden Maddox came to my cell . . . making threat[s], telling me that I don't run shit at his facility, and that he don't give a damn about me requesting protective management, and that he will . . . see to it that I'm seated with the other inmates when I'm transferred. He told me that he don't give a damn if I'm assaulted by an inmate, and if I file a grievance, . . . he would see to it that I won't see y'all until I'm released.

*Id.* at 84-85. Mr. DeWitt told his mother not to contact the prison because "the warden will find out, and he will retaliate against me." *Id.* at 86. Mr. DeWitt testified that Warden Maddox placed the Maddox Memorandum in Mr. DeWitt's FDC classification file on April 4, demanding that Mr. DeWitt not be placed in protective movement during his transfer. *Id.* at 94-96.

On April 5, 2018, officers woke Mr. DeWitt up for transfer. *Id.* at 153-54. Warden Maddox informed Mr. DeWitt that he had advised staff to make sure Mr. DeWitt was transferred without protection. *Id.* at 94. Mr. DeWitt refused to leave his cell, so FDC officers forcibly extracted him from his cell to the bus. *Id.* at 157, 160-61.

On the bus, two people approached Mr. DeWitt. *Id.* at 173. When Mr. DeWitt stood up, one man grabbed and held him, while the other cut his back with a razor blade. *Id.* Mr. DeWitt suffered seven lacerations to his back. *Id.* at 169.

Mr. DeWitt was escorted to the medical unit after the bus arrived at Apalachee and treated at 12:26 p.m. *Id.* at 166, 175, 179; Doc. 229 at 108-09. Ms. Caswell, an FDC-employed nurse, testified that a contemporaneous nurse assessment found that Mr. DeWitt sustained

several cuts to his back. Doc. 229 at 120. Mr. DeWitt also reported the incident to Officer Michael Brown, a command sergeant at Apalachee, at 5:20 p.m. Doc. 231 at 90.

Mr. DeWitt called two Northwest classification officers, Stephanie Justice and Kimberly Hauser, to testify about the protective management process and Mr. DeWitt's April 4 request for protection. Officer Justice explained that protective management requests are reviewed by the Institution Classification Team ("ICT"). *Id.* at 138. She stated that Warden Maddox was in the ICT in 2018, *id.* at 139, during the time when Mr. DeWitt was attacked while being transferred from Northwest.

Officer Hauser testified that she received Mr. DeWitt's request on April 4 but did not process it before Mr. DeWitt's transfer the next day. *Id.* at 187-88. She pointed to FDC policy and said that officials are only required to address those requests filed at the location an individual is "presently assigned." *Id.* at 191-92, 194. She expressed her view that because Mr. DeWitt was set for transfer from Northwest on April 5, ICT was not obligated to meet and investigate the circumstances. *Id.* at 200.

Officer Justice further addressed Mr. DeWitt's concerns about being housed with known enemies at Apalachee. *Id.* at 163, 165; *see* Doc. 187-2 at 61, 65. Officer Justice testified that Mr. DeWitt's list of known enemies included the name Quivoz Hernandez. Doc. 229 at 163-65. Officer Justice also testified that Mr. DeWitt reported that FDC officials tried to house him with Mr. Hernandez. *Id.* at 158; Doc. 187-2 at 56. Defense counsel claimed that Mr. DeWitt's list of known enemies differed from FDC's version, which did not include Mr. Hernandez. Doc. 230 at 24. Mr. DeWitt countered that FDC redacted Mr. Hernandez's name. Doc. 232 at 95. He testified that he wrote names in rows of five, and he would not have skipped a slot when there was space. Docs. 230 at 24; 232 at 93-95.

Mr. DeWitt lastly testified that grievances—and especially repeated grievances—against correctional officers led to retaliation "to prove a point" and silence individuals. Doc. 230 at 107. FDC officers retaliated by withholding food, gassing individuals, and committing physical assaults. *Id.* Mr. DeWitt explained that he did not file any grievances against Warden Maddox after April 5 due to his fear of Warden Maddox's retaliation. Doc. 232 at 98.

### B. Warden Maddox's Defense

Warden Maddox asserted that he had no reason to believe Mr. DeWitt was in danger. Doc. 229 at 75-76. Warden Maddox denied telling Mr. DeWitt that if he filed grievances, Mr. DeWitt would not see his family until he was released from prison. Doc. 231 at 126. He also denied ordering Mr. DeWitt's cell extraction or saying that he would make sure Mr. DeWitt was seated among other passengers. *Id.* at 126-27. And he said that he never told Mr. DeWitt that he "didn't give a damn" what Mr. DeWitt requested or whether he would be assaulted on the bus. *Id.* at 126.

Defense counsel also challenged Mr. DeWitt's credibility and contested many of Mr. DeWitt's documents. Doc. 232 at 71. The disputes over the documents largely resulted from a now-repealed FDC regulation that required FDC to make and maintain a copy of each correspondence received from an incarcerated individual and return the original. Doc. 230 at 19. The defense claimed that Mr. DeWitt altered his documents after receiving back the originals. *Id.* at 24.

Warden Maddox testified that although wardens cannot override an ICT transfer decision, they can specify that someone be transferred in

a particular way. Doc. 231 at 103. He suggested that, had he known that Mr. DeWitt was receiving threats or in danger, he would have "either stopped the transfer" or transferred him by other means. *Id.* at 115.

Warden Maddox challenged the authenticity of the Maddox Memorandum, which stated that Mr. DeWitt should not receive protection during his transfer. *Id.* at 113-14; Doc. 187-2 at 10. He testified that neither he nor anyone in his office created the document. Doc. 231 at 114. Mr. DeWitt explained—during his closing statement—that the Memorandum was authentic because he had received it from FDC and it had been created on a computer with internet access, which he lacked while on lockdown in FDC custody. Doc. 232 at 32, 45.

Warden Maddox also denied speaking with Mr. DeWitt on April 4 and 5, 2018. Doc. 231 at 99. He stated that he worked from 8:00 a.m. to 4:00 p.m. on those two days. *Id.* at 123. On cross-examination, Mr. DeWitt challenged Warden Maddox's account with work logs showing that Warden Maddox worked twelve hours on each of those days. *Id.* at 123-24. Warden Maddox then conceded that he worked twelve hours on those days, but he maintained that he did not see Mr. DeWitt on the morning of April 5. *Id.* at 124.

Mr. DeWitt also introduced documents challenging Warden Maddox's testimony that he had no prior interactions with Mr. DeWitt. *Id.* at 119. These included an October 6, 2017 complaint that Mr. DeWitt filed against Warden Maddox. *Id.* at 119-20. And a December 5, 2017 request from Warden Maddox for Mr. DeWitt to undergo a mental health evaluation. *Id.* at 121; Doc. 232 at 37-38.

Beyond Warden Maddox, the defense presented Jessica Santiago, a Northwest Classification Supervisor, to contest Mr. DeWitt's claim that Ms. Peterson personally handed Mr. DeWitt the Peterson Memorandum. Doc. 231 at 62-63. Ms. Santiago testified as Ms. Peterson's supervisor that staff like Ms. Peterson did not generally meet with incarcerated individuals. *Id.* at 62-64. But she acknowledged that she did not know whether Ms. Peterson personally handed Mr. DeWitt the Memorandum. *Id.* at 66.

In closing arguments, the defense returned to challenging Mr. DeWitt's credibility. Doc. 232 at 56. It suggested that Warden Maddox did not know the threat Mr. DeWitt faced because Mr. DeWitt did not specify the names of the individuals threatening him. *Id.* at 56, 75. And even if Warden Maddox was aware that individuals were threatening to

kill Mr. DeWitt, Warden Maddox had no authority to intervene with the transfer. *Id.* at 73-74.

### C. Mr. DeWitt's Difficulties with His Vision During Trial

Mr. DeWitt wore bandages over his eye during trial as treatment for his vision impairment. Doc. 230 at 186. He tried to explain why to the jury, but the court sustained defense counsel's objection and directed him to refrain from further explanation. *Id.*

Mr. DeWitt experienced repeated difficulties seeing documents during trial. When referencing a protective management request he filed in April 2018, for instance, Mr. DeWitt spent time searching through papers at the witness stand before locating and publishing the document. *Id.* at 70. He asked defense counsel to zoom in on the text because he could "hardly see it." *Id.* at 71. While being cross-examined, Mr. DeWitt requested a closer review of documents on multiple occasions. *Id.* at 128, 130, 132. At one point, when asked whether a disputed document was an original, he initially responded, "Absolutely, yes, sir," shortly before clarifying, "No, that's not my document. That's not my original." *Id.* at 126. Similarly, when the court asked if he objected to his known enemies list, Mr. DeWitt stated, "I haven't seen it," prompting the court to reply,

"You're looking at it right now." *Id.* at 139. Only after confirming with the district court that the exhibit was a copy of his document did Mr. DeWitt state that he had no objection. *Id.*

Mr. DeWitt's blindness also hampered his presentation of medical records, which documented injuries from the gang member assault that resulted in his forty-six-day hospital stay. *Id.* at 100-03. He relied several times on the court's assistance while attempting to read the report. *Id.* at 102, 103.

Mr. DeWitt also described difficulties filing prior complaints due to his vision impairment. *Id.* at 184-85. He explained that his blindness prevented him from completing his own filings and that he had to rely on his fiancée to write the name of the defendant and file the complaint. *Id.* at 185-88. Mr. DeWitt acknowledged that he first had to dismiss an incorrectly filed complaint because he realized the complaint listed the incorrect defendant. *Id.* at 198. But he explained that the complaint was filed against Warden Mashburn because another officer, Officer Moran, had provided Mr. DeWitt with a statement saying that he heard "Warden Mashburn" make threats against Mr. DeWitt. *Id.* at 87-88. Mr. DeWitt's

fiancée had looked at Officer Moran's statement to write in the defendant's name. *Id.* at 198.

## SUMMARY OF THE ARGUMENT

As a blind, pro se litigant, Mr. DeWitt was unable to effectively litigate his case without the assistance of counsel and was entitled to appointment of counsel. Before and during trial, Mr. DeWitt repeatedly told the district court that he could not review discovery, independently verify information, examine witnesses, or even read the documents in front of him. These limitations hampered his ability to complete basic trial tasks. Mr. DeWitt's diligence could not have overcome these barriers, and the resulting breakdowns undermined both the clarity of his case and the fairness of the proceedings. The district court thus abused its discretion in denying him counsel. It also abused its discretion by not engaging in reasoned consideration of Mr. DeWitt's requests.

The district court further abused its discretion when it excluded several of Mr. DeWitt's crucial witnesses and evidence. These witnesses would have attested to the accuracy of Mr. DeWitt's documents and debunked the defense's theory that Mr. DeWitt forged documents. First, the district court wrongly excluded Mr. Beavers, an FDC administrator, from testifying. Mr. Beavers would have been pivotal in explaining why Mr. DeWitt's documents were genuine. Next, the court wrongly excluded

Officer House from testifying. Officer House's testimony would have confirmed that he had signed the House Form and heard others at Liberty threatening Mr. DeWitt. Finally, the district court wrongly disallowed Mr. DeWitt from calling his expert witness, Ms. Ottinger, to testify that Mr. DeWitt could not have forged the documents he presented, improperly rejecting that request before and during trial and in Mr. DeWitt's motion for a new trial.

The court plainly erred by excluding documents demonstrating that Warden Maddox was aware that Mr. DeWitt was in danger. The court wrongly excluded the Peterson Memorandum, which confirmed that Warden Maddox had been informed of Mr. DeWitt's safety concerns. And it wrongly struck the Yates Request, which confirmed that Mr. DeWitt reported threats from incarcerated individuals at Northwest. Both documents were admissible business records, Mr. DeWitt sought to introduce the Yates Request for notice, and the court excluded them from trial without basis.

The court finally abused its discretion when it rejected Mr. DeWitt's request for disqualification and improperly investigated Mr. DeWitt's litigation history. The judge performed the wrong analysis, rejecting

disqualification only because he could not remember his past interactions with Mr. DeWitt. The proper evaluation was whether an objective observer might think the judge had an appearance of impropriety, and Mr. DeWitt was entitled to an evidentiary hearing. The judge then inappropriately investigated the facts of Mr. DeWitt's claims of bias. Such ex parte actions were improper because judges must decide issues and cases only based on the information provided to them.

# ARGUMENT

## I. THE DISTRICT COURT ERRED BY DENYING APPOINTED COUNSEL.

Mr. DeWitt needed counsel because his case presented exceptional circumstances. These included his inability to adequately present and investigate his case due to his blindness, nuanced evidentiary demands requiring skilled litigation, and broader interests of fairness and judicial efficiency. Taken together, Mr. DeWitt's circumstances far exceeded those of the average pro se litigant. Alternatively, the district court abused its discretion when it summarily dismissed his requests, depriving him of the reasoned ruling to which he was entitled.

### A. Mr. DeWitt's Blindness and the Complexities of His Case Constituted Exceptional Circumstances.

Mr. DeWitt deserved counsel because he "need[ed] help in presenting the essential merits of his . . . position to the court." *Kilgo v. Ricks*, 983 F.2d 189, 193 (11th Cir. 1993). Each of the "exceptional circumstances" factors favored appointing counsel: (1) Mr. DeWitt was unable to adequately present his case; (2) he was unable to adequately investigate his case; (3) the nature of the evidence required skilled representation; (4) the case was legally and factually complex; and (5) appointment of counsel would have promoted a fair and efficient trial.

*DeJesus v. Lewis*, 14 F.4th 1182, 1204 (11th Cir. 2021). These factors collectively demonstrate that the district court abused its discretion in denying Mr. DeWitt's requests. *See Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1065 (11th Cir. 2013).

#### *1. Mr. DeWitt's Blindness and Lack of Representation Prevented Him from Adequately Presenting His Case.*

Mr. DeWitt could not read the primary documents in his case. That single fact shaped every stage of trial. His blindness left him "unable to see and read trial documents," Doc. 69 at 1, review exhibits, verify evidence, or prepare effective examinations—tasks that are fundamental to any litigant's ability to present a case. During trial, Mr. DeWitt's medical condition required him to wear an occlusive patch over one eye, which blocked most of his vision in that eye. Doc. 230 at 186. His uncovered eye was completely blind. *Id.*; Doc. 69 at 4.

Trial proceedings are uniquely demanding, even for sighted litigants, because they involve complex evidentiary and procedural tasks "beyond the ability of most pro se litigants." *Perez v. Fenoglio*, 792 F.3d 768, 785 (7th Cir. 2015). They were even more demanding for Mr. DeWitt. Unlike pre-trial filings, where he occasionally received informal

assistance from his fiancée, Mr. DeWitt faced trial alone. Counsel could have alleviated the burdens imposed by his blindness.

The defense challenged Mr. DeWitt's evidence and accused him of falsifying key documents. Resolving these disputes required visual comparison of exhibits and precise questioning to expose inconsistencies and highlight corroborating details. But Mr. DeWitt was unable to see many key documents during trial, severely "hinder[ing] [his] ability to present the essential merits of his case." *Smith*, 713 F.3d at 1065; *Neal v. Cassiday*, 511 F. App'x 865, 866 (11th Cir. 2013) (finding "exceptional circumstances that warrant appointment" because "[a]lthough [plaintiff's] legal claims were neither novel nor unusually complex, his pre-existing partial blindness . . . significantly undermined his ability to prepare for trial").

Mr. DeWitt repeatedly noted his inability to read the documents in front of him. *See* Doc. 230 at 130 (saying "I really can't see it" when looking at a document); *see also id.* at 71 (noting that he could not see the document presented to him), 94 (same), 128 (same). And he frequently relied on the court for assistance when engaging with documents. *See, e.g.*, Docs. 229 at 163 (relying on the court to indicate which part of an

exhibit he should direct the witness's attention to); 230 at 102-03 (relying on the court to read medical report); 139 (relying on the court to clarify the document in front of him).

Unable to complete basic trial tasks, Mr. DeWitt's disability precluded him from meaningfully accessing the court. *See Merritt v. Faulkner*, 697 F.2d 761, 763-65 (7th Cir. 1983). His inability to engage with documents makes it "difficult to envision how [he] possibly could have conducted a thorough cross-examination." *Naranjo v. Thompson*, 809 F.3d 793, 800 (5th Cir. 2015). Although Mr. DeWitt resourcefully relied on witnesses to read documents aloud during trial, his doing so underscored his inability to analyze key evidence. Docs. 229 at 154-58 (asking the witness to read three separate exhibits); 231 at 121 (asking Warden Maddox to read a document into the record for a second time).

*2. Mr. DeWitt's Blindness and Lack of Counsel Prevented Him from Adequately Investigating His Case.*

Mr. DeWitt lost his case before trial even started. He was "not in a position to adequately investigate and prepare for his case." *DeJesus*, 14 F.4th at 1206 ("[Plaintiff's] lack of familiarity with the discovery materials affected his ability to prepare for trial" and "clearly weighs in favor of appointing counsel."). Mr. DeWitt alerted the court to his

inability to "investigate crucial facts." *Merritt*, 697 F.2d at 765 (appointing counsel for a blind, pro se litigant). Before trial, Mr. DeWitt requested an extension because he "couldn't see the filed documents." Doc. 231 at 140. And he previously filed a complaint against an incorrect defendant because his blindness prevented him from independently verifying the accuracy of his filing. *See* Doc. 230 at 185-86.

These examples illustrate a critical disadvantage. Unlike sighted litigants who can personally examine and organize their filings, Mr. DeWitt's blindness forced him to depend on others for basic investigative tasks. *See Henderson v. Ghosh*, 755 F.3d 559, 567 (7th Cir. 2014) (finding counsel necessary when plaintiff's cognitive impairments rendered him "incapable of obtaining the witnesses and evidence he needed to prevail on his claims"). This increased the risk of error and undermined his ability to build a coherent case.

That disadvantage became even more pronounced when Mr. DeWitt received more than a thousand pages of FDC classification records after his pretrial witness and exhibit deadlines. Although Mr. DeWitt's witness and exhibit lists were due on July 24, 2023, Doc. 59, he did not receive the classification records until August 4, 2023, Doc. 82

at 2. Reviewing and processing those 1,833 pages of FDC records was nearly impossible for a blind, pro se litigant. *Id.* Had counsel been appointed, that person could have processed and carefully analyzed FDC's records, ensured compliance with deadlines, and prevented Mr. DeWitt's procedural missteps.

These limitations were not minor inconveniences—they imposed a substantial barrier to effective investigation. Without the capacity to review evidence, verify facts, or organize thousands of pages of discovery materials, Mr. DeWitt entered trial at a profound disadvantage that no amount of diligence could overcome. *See Smith*, 713 F.3d at 1064-65 (finding exceptional circumstances where plaintiff was unable to interview witnesses and access discovery).

*3. Mr. DeWitt's Case Required Skilled Representation Beyond His Capabilities.*

The litigation demands of Mr. DeWitt's case far exceeded his ability as a pro se litigant. And the nature of his case was "such that the truth w[ould] more likely be exposed when both sides are represented by counsel." *Merritt*, 697 F.2d at 765. His challenges began before trial and persisted throughout it.

Before trial, Mr. DeWitt had to juggle voluminous discovery and difficult civil procedural rules. Just ten days after receiving thousands of pages of records, Mr. DeWitt sought to call Ms. Ottinger, a handwriting expert, to corroborate his assertion that his documents were authentic. *See* Doc. 79 at 4. Despite Mr. DeWitt's pro se status, the district court denied Mr. DeWitt this opportunity solely on timeliness of disclosure and insufficient compliance with procedural rules. Doc. 83. Mr. DeWitt's errors were not the result of neglect; they were the predictable consequence of forcing a blind litigant to navigate intricate evidentiary rules without assistance. *See Kilgo*, 983 F.2d at 193-94 (complex pretrial instructions "erect unnecessary procedural barriers" for pro se litigants). Counsel experienced in handling discovery and expert disclosures could have leveled the playing field.

At trial, Mr. DeWitt's claims turned on credibility determinations regarding the authenticity of key documents—issues that required "skill in the presentation of evidence and in cross examination." *DeJesus*, 14 F.4th at 1204 (internal quotations omitted); *see Poindexter v. F.B.I.*, 737 F.2d 1173, 1189 (D.C. Cir. 1984) ("[R]epresentation by counsel may be essential" when there is "complex testimony" or "difficult legal issues.").

If Mr. DeWitt had had counsel, defense counsel's nearly thirty objections during Mr. DeWitt's testimony likely would not have happened. Doc. 230 at 43-199. Counsel could have structured examinations to connect testimony to exhibits, impeach witnesses effectively, and ensure that the jury understood the central events that formed Mr. DeWitt's claims. *See Merritt*, 697 F.2d at 765.

*4. Mr. DeWitt's Case Was Legally and Factually Complex.*

The substantive complexities of Mr. DeWitt's case exceeded what a blind, pro se litigant could reasonably navigate. His case involved overlapping constitutional doctrines, difficult legal standards, and complex evidentiary burdens. *See DeJesus*, 14 F.4th at 1205; *Maclin v. Freake*, 650 F.2d 885, 889 (7th Cir. 1981) ("[W]here the law is not clear, it will often best serve the ends of justice to have both sides of a difficult legal issue presented by those trained in legal analysis.").

Mr. DeWitt's Eighth Amendment deliberate indifference claim was "factually" and "legally complicated." *DeJesus*, 14 F.4th at 1205; *see Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010) (noting "the difficulty that prisoners face when litigating constitutional claims that involve" a defendant's "state of mind"). In order to show deliberate indifference, Mr.

DeWitt needed to elicit testimony from classification officers about FDC rules and policies, Doc. 229 at 137-38, the structure and composition of the ICT, *id.* at 138-40, and the differing procedures for investigating grievances, *id.* at 174-75, 184-85, 191-92. Because he was unable to read the documents in front of him or see the witnesses he was questioning, Mr. DeWitt was unequipped to contend with these complex bureaucratic systems and to engage in strategic cross-examination to show how Warden Maddox's conduct deviated from institutional norms.

Mr. DeWitt's First Amendment retaliation claim added a layer of complexity. *See Abdullah v. Gunter*, 949 F.2d 1032, 1036 (8th Cir. 1991). Mr. DeWitt needed to simultaneously show that he placed Warden Maddox on notice of his fears by filing grievances while explaining that he stopped filing grievances for fear of retaliation. *See Hall v. Merola*, 67 F.4th 1282, 1294 (11th Cir. 2023). Such nuanced arguments would have been aided by counsel.

The case only grew more complex as proceedings developed. Warden Maddox's accusation that Mr. DeWitt fabricated documents introduced new evidentiary disputes that required demanding credibility assessments and authenticity determinations. *See* Doc. 230 at 133;

Doc. 231 at 113-14; *Naranjo*, 809 F.3d at 801 (finding exceptional circumstances when "proceedings developed significantly between the first and second motions for counsel").

5. *Appointment of Counsel Would Have Sharpened the Issues and Promoted a Just Determination.*

Appointed counsel ordinarily help to clarify the issues and promote judicial efficiency and fairness. *See Smith*, 713 F.3d at 1065; *Merritt*, 697 F.2d at 764 n.3 ("An underlying assumption of the adversarial system is that both parties will have roughly equal legal resources. This assumption is destroyed when only one side is represented."). But this was not just ordinary prejudice. Mr. DeWitt's blindness rendered the proceedings "fundamentally unfair." *McCarthy v. Weinberg*, 753 F.2d 836, 840 (10th Cir. 1985). His disability exacerbated the burdens of litigating his complex case, making representation particularly necessary to "aid in [its] efficient and equitable disposition." *Ricks v. Khan*, 135 F.4th 296, 302-03 (5th Cir. 2025) (internal quotations omitted).

Mr. DeWitt experienced repeated procedural breakdowns—disorganized examinations, witnesses reading entire exhibits into the record, and difficulty navigating voluminous documents—which required

the jury to endure numerous pauses in proceedings. *See* Docs. 229 at 154-58, 168, 170-72, 176; 230 at 201-02. These breakdowns not only undermined the clarity of Mr. DeWitt's case but also prolonged the proceedings and placed an unnecessary burden on the court's ability to fairly and efficiently manage the proceedings. *See Ricks*, 135 F.4th at 302-03.

Mr. DeWitt's risks of prejudice were heightened by the dynamics of a jury trial. Jurors are often less equipped to contextualize a pro se litigant's conduct, especially when that conduct is shaped by disability. *See Abdullah*, 949 F.2d at 1036 ("[T]he absence of counsel will more likely have a prejudicial impact on the minds of jurors, to the disadvantage of the pro se litigant."). There were multiple instances where Mr. DeWitt's disability and lack of guidance may have undermined his credibility and contributed to unfavorable impressions, including Mr. DeWitt removing his shirt to show scars, Doc. 229 at 116, preemptively addressing his prior conviction, Doc. 230 at 44, and repeatedly apologizing, *see, e.g.*, *id.* at 56. Counsel would have mitigated these issues and helped ensure that the jury received a coherent and fair presentation of the case. *See Smith*, 713 F.3d at 1065.

* * *

As this Court has made clear, "no single factor requires appointment of counsel," but "in the aggregate," the presence of multiple impairments and procedural burdens "necessitate[s] appointment of counsel." *Id.* Mr. DeWitt's case presents precisely the kind of exceptional circumstances that this standard was designed to address. This Court should vacate the district court's judgment, remand with instructions to appoint counsel for a new trial, and overturn the district court's judgment on costs. *See Neal*, 511 F. App'x at 866.

### B. The District Court's Rulings Denying Counsel Fell Short.

In the alternative, the district court erred by failing to meaningfully consider Mr. DeWitt's requests for counsel. Mr. DeWitt "was entitled to a reasoned ruling" consisting of an individualized assessment under the five-factor test. *Steele v. Shah*, 87 F.3d 1266, 1271 (11th Cir. 1996), *as amended* (Sep. 6, 1996). The district court failed to provide a reasoned ruling.

It denied Mr. DeWitt's first motion with only a conclusory statement that he had "been sufficiently able to represent himself throughout this litigation," noting that his blindness had existed for

years. Doc. 71 at 2. It offered no analysis for how Mr. DeWitt's vision impairment affected his ability to litigate, nor did it assess the case's complexity or evidentiary burdens. *See Perez*, 792 F.3d at 785 ("District courts abuse their discretion where they fail to consider the complexities of advanced-stage litigation activities and whether a litigant is capable of handling them."); *Jackson v. Dallas Police Dep't*, 811 F.2d 260, 262 (5th Cir. 1986) ("In considering motions for appointment of counsel . . . district courts should make specific findings on each of the [exceptional circumstances] factors rather than deciding the motion in a conclusory manner.").

The court then denied Mr. DeWitt's subsequent request for standby counsel to assist him during his testimony, noting merely that appointment of counsel is warranted in "very limited circumstances." Doc. 240 at 12-14. The court again failed to "adequately explain [its] bare assertion that the necessary circumstances were absent from this case." *Steele*, 87 F.3d at 1271. Instead of engaging with the specific procedural and evidentiary demands of Mr. DeWitt's case, the court inappropriately discussed the practical challenges associated with finding lawyers to handle civil cases. It did not explain why his blindness did not warrant

intervention. The court's inattention to Mr. DeWitt's requests warrants remand.

## II. THE EXCLUSION OF KEY WITNESSES AND EVIDENCE WAS IMPROPER.

The district court abused its discretion when it determined that Mr. Beavers' testimony was irrelevant, refused to subpoena Officer House to testify at trial, and ignored Mr. DeWitt's need for an expert witness. *See United States v. Novaton*, 271 F.3d 968, 1005 (11th Cir. 2001). The court also plainly erred by excluding two exhibits as hearsay—the Peterson Memorandum, which evinced Warden Maddox's awareness of and disregard for Mr. DeWitt's request for protection during transfer, and the Yates Request, which demonstrated Northwest officers' awareness of Mr. DeWitt's subjection to repeated gang threats. *See United States v. Williams*, 527 F.3d 1235, 1247 (11th Cir. 2008).

### A. Mr. Beavers' Testimony Was Highly Relevant, and the District Court Abused its Discretion by Excluding Him.

Because Mr. DeWitt demonstrated the relevance of Mr. Beavers' anticipated testimony, Doc. 79 at 2, the district court erred when it imposed the "extraordinary remedy" of exclusion. *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002). As an FDC Correctional

Services Administrator in the Central Records Office, Mr. Beavers would have testified about the authenticity of Mr. DeWitt's classification records. *Id.* He also would have explained "the redaction" of certain records in Warden Maddox's possession, as "compared to the original non-redacted document[s]" that Mr. DeWitt planned to introduce at trial. Doc. 79 at 2. The district court erred by not looking at Mr. Beavers' testimony "in a light most favorable to its admission, maximizing its probative value." *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010) (quotation marks omitted).

Separately, the district court abused its discretion when it granted Warden Maddox's motion to strike Mr. Beavers without giving Mr. DeWitt an opportunity to respond. *See Seamon v. Remington Arms Co.*, 813 F.3d 983, 987 (11th Cir. 2016). Completely denying Mr. DeWitt "the opportunity to be heard on a material issue" is "never harmless error." *United States v. Smith*, 30 F.4th 1334, 1338 (11th Cir. 2022) (quotation marks omitted). The Northern District of Florida provides litigants fourteen days to respond to motions. N.D. Fla. Loc. R. 7.1(E), (G); *see* N.D. Fla. Loc. R. 7.1 (H) (denial is appropriate if "opposing party does not file a memorandum as required"); Doc. 16 at 8 ("All motions and

responses shall be served and filed within the time required by . . . the Local Rules of this Court.") But the district court denied Mr. DeWitt that opportunity. It instead granted Warden Maddox's motion to strike five days after it was filed. Doc. 83 at 3-4. By not waiting to "hear[] from" Mr. DeWitt and allowing him to present the "factual and legal bases" supporting Mr. Beavers' relevance at trial, the district court abused its discretion. *See Smith*, 30 F.4th at 1338.

The district court also failed to identify what legal standard it applied to exclude Mr. Beavers, denying this Court meaningful review. *See United States v. Johnson*, 877 F.3d 993, 999-1000 (11th Cir. 2017). The district court did not mention the federal rules of evidence. *See* Doc. 83 at 3-4; *Broadwater v. United States*, 292 F.3d 1302, 1304 (11th Cir. 2002). It offered only that no party argued relevant records had been altered, so Mr. Beavers' testimony was a "red herring." Doc. 83 at 4. This Court can neither "just reflexively presume that the learned judge appropriately exercised his discretion and considered all of the relevant factors," *Johnson*, 877 F.3d 993 at 999-1000 (quotation marks omitted), nor "rubber stamp" such an order, *United States v. Docampo*, 573 F.3d

1091, 1104 (11th Cir. 2009) (Barkett, J., concurring in part). The district court's decision must therefore be reversed on this ground as well.

Even assuming that it appropriately identified the legal standard, the court further abused its discretion when it determined that Mr. Beavers' testimony was irrelevant. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1309 (11th Cir. 2016). Mr. DeWitt's classification and grievance documents were not just relevant but critical to proving that: (1) Mr. DeWitt's unprotected transfer posed a substantial risk of serious harm, and (2) Warden Maddox was deliberately indifferent to that risk. *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1977); Doc. 24 at 15-16. Mr. DeWitt reported to prison officials—through classification documents, inmate requests, and grievances—that other incarcerated individuals repeatedly threatened him. Doc. 230 at 52-53; *see* Doc. 187-2 at 63, 65. He needed Mr. Beavers to demonstrate the accuracy of his records to establish that FDC employees were aware of those threats. *See Cardwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1101-02 (11th Cir. 2014). Mr. Beavers' anticipated testimony about FDC's record-redaction process would likely have bolstered Mr. DeWitt's credibility.

As Mr. DeWitt predicted, testimony about the veracity of those documents proved pivotal at trial and likely "substantially swayed" the jury. *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946); *see Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1446 (11th Cir. 1984). Mr. DeWitt introduced the House Form, where Officer House confirmed that he heard inmates threatening Mr. DeWitt "that they are going to kill [him] when they catch" him. Docs. 230 at 55; 187-2 at 63. Mr. DeWitt also introduced a signed document demonstrating that, even after his April 5 assault, he was housed with a known enemy that he had reported to FDC staff. Docs. 229 at 164, 165; 230 at 120; 187-2 at 56, 65. The defense disputed the documents' genuineness, arguing that Mr. DeWitt had altered them. Docs. 229 at 166; 232 at 64-65; *compare* Doc. 187-2 at 64, *with* Doc. 187-2 at 63. Mr. DeWitt responded that FDC had redacted these documents and his were the originals. Doc. 230 at 59. When pressed for an explanation for the differences, Mr. DeWitt was forced to say, "I have no idea." *Id.* at 127. By the end of trial, the jury was therefore left with a "he-said, he-said" dispute. The defense centered its closing argument on Mr. DeWitt's credibility, lambasting him as a liar and a forger. Doc. 232 at 59.

Mr. Beavers' anticipated testimony would have resolved that "he-said, he-said" dispute, and confirmed the reason the documents differed. FDC redacted Mr. DeWitt's records, and Mr. DeWitt retained the originals. Doc. 230 at 19. Mr. Beavers' exclusion from trial was a clear abuse of discretion.

### B. Officer House's Testimony Would Have Restored Mr. DeWitt's Credibility.

The court abused its discretion when it denied Mr. DeWitt's belated request to subpoena Officer House to testify. Doc. 134; *see Romero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir. 2008). District courts have discretion to enforce their scheduling orders. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1306-07 (11th Cir. 2011). But they abuse that discretion when (1) the "explanation" for failing to disclose the witness, (2) the "importance of the testimony," and (3) the "prejudice to the opposing party" weigh in favor of permitting the witness to testify. *Romero*, 552 F.3d at 1321 (quotation marks omitted). Those factors all favored Mr. DeWitt.

*First*, Mr. DeWitt sufficiently explained why he neglected to include Officer House in his final witness list. Mr. DeWitt had long included Officer House on his prospective witness lists, highlighting his relevance

to the litigation. Docs. 64 at 8; 67 at 7. But when the court directed Mr. DeWitt to "limit his witnesses" or explain why multiple similar witnesses were "necessary," Doc. 65 at 3, Mr. DeWitt understood that to mean he was required to "actually cut" his witness list down, Doc. 241 at 6. He reduced the list from twenty-two to seven, including himself. Doc. 79.

Once the court clarified that he merely needed to explain why his witnesses were "relevant," Mr. DeWitt renewed his request for Officer House. Doc. 241 at 6. Given that Mr. DeWitt was pro se, such a misunderstanding of the court's order to "limit his witnesses" is excusable. Doc. 65 at 3; *see Clemons v. Comm'r, Ala. Dep't of Corr.*, 967 F.3d 1231, 1244 (11th Cir. 2020) (instructing courts "to treat pro se litigants leniently"). And confusion regarding court orders provides a plausible explanation for the failure to include pre-trial material. *See E.E.O.C. v. Troy State Univ.*, 693 F.2d 1353, 1357 (11th Cir. 1982).

*Second*, Officer House's anticipated testimony would have corroborated "crucial" testimony that Mr. DeWitt reported inmate threats, officers confirmed their awareness of those threats, and the documents reporting those threats were authentic. *United States v. Ethridge*, 948 F.2d 1215, 1218 (11th Cir. 1991). The defense highlighted

during opening and closing that Warden Maddox could not have known the dangers Mr. DeWitt faced. Docs. 229 at 74; 232 at 56, 87. As Mr. DeWitt explained to the court, Officer House's anticipated testimony would directly rebut that theory. Doc. 130 at 4. Officer House could have testified that Mr. DeWitt consistently reported threats from incarcerated individuals to FDC staff. *Id.*

Officer House could have further testified that he witnessed those threats himself. Doc. 187-2 at 63. Notably, many of those same incarcerated individuals were transferred from Northwest to Apalachee with Mr. DeWitt on the day he was attacked—April 5, 2018. *Id.*[4] Officer House could also have confirmed the authenticity of Mr. DeWitt's version of the House Form, thereby dispelling the defense's theory that Mr. DeWitt forged it. Docs. 229 at 76; 232 at 56-91. Excluding Officer House had a substantial prejudicial effect on Mr. DeWitt's case. *Goulah v. Ford Motor Co.*, 118 F.3d 1478, 1483 (11th Cir. 1997).

[4] As he feared might happen when he reported these threats to Officer House, Mr. DeWitt was attacked during his transfer from Liberty to Northwest. *See* Letter of Steven R. DeWitt, ECF No. 45 at 1-3, *DeWitt v. Florida*, No. 4:15-cv-00433 (N.D. Fla. Aug. 17, 2017).

*Third*, Mr. DeWitt's belated request to subpoena Officer House did not prejudice Warden Maddox. Mr. DeWitt sought to subpoena Officer House on November 21, 2023, over two months before the trial's scheduled start date and over six months before the trial's actual start date. *See* Docs. 125; 130; 144. And the defense had notice of Officer House because Mr. DeWitt requested him in his first and second witness lists. Docs. 64 at 8; 67 at 7. The defense also had an opportunity to depose Officer House because he worked for FDC. Mr. DeWitt's motion provided the defense more than sufficient time to schedule that deposition. *See Meyers v. Pennypack Woods Home Ownership Ass'n.*, 559 F.2d 894, 905 (3d Cir. 1977) (finding three weeks sufficient for a party to address a late-disclosed witness). All in all, Warden Maddox would hardly be disadvantaged by permitting Mr. DeWitt to call a witness that everyone knew was important to this case.

Even were Warden Maddox prejudiced by Mr. DeWitt's request, "exclusion of the evidence is an 'extreme' sanction; indeed, it is the most severe remedy a court can impose short of declaring a mistrial." *United States v. Rodriguez*, 765 F.2d 1546, 1557 (11th Cir. 1985) (citation omitted). Because Mr. DeWitt was pro se and the trial was months away,

a lesser sanction—such as extending the discovery period to permit a deposition—was required.

### C. Rejecting Mr. DeWitt's Attempt to Call Ms. Ottinger Was Improper.

The district court abused its discretion when it prevented Mr. DeWitt from calling an expert witness to rebut the defense's ever-broadening forgery theory. *See United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir. 2004) (*en banc*). After being "alerted" to a document in FDC's possession during the first day of trial, defense counsel argued that Mr. DeWitt had "altered" certain "original" exhibits. Doc. 230 at 24-25, 263; *see also* Doc. 229 at 169. In response, Mr. DeWitt moved for a mistrial, underscoring his need for trial assistance and explaining he did not alter his documents. Doc. 230 at 3, 10, 33. The district court conceded that a mistrial might be warranted if this dispute "was a complete shock," but it stated that the parties had "exchanged different documents and disagree[d] about who said what to who[m]," which was "nothing new." *Id.* at 34. This was an abuse of discretion.

The court had an "obligation to look behind the label" of Mr. DeWitt's mistrial motion and construe it as a renewed request for an expert witness to rebut the defense's forgery theory. *See United States v.*

*Jordan*, 915 F.2d 622, 624-25 (11th Cir. 1990); *cf. Castro v. United States*, 540 U.S. 375, 381-82 (2003) (noting that federal courts often recharacterize pro se litigants' motions to better correspond to the substance of the motion). Mr. DeWitt had long hoped to present an expert at trial, anticipating that the defense would challenge the authenticity of his exhibits—most notably, the Peterson Memorandum. Docs. 79 at 4 (requesting permission to call Ms. Ottinger as a handwriting expert); 187-5 at 1. But the district court rejected his efforts on timeliness grounds, while also asserting that there were no handwriting disputes in this case. Doc. 83 at 3.

Mr. DeWitt's foresight proved accurate. At trial, the defense disputed the authenticity of the Peterson Memorandum, Maddox Memorandum, and House Form. Docs. 229 at 18-20, 166; 230 at 62-63, 133; 231 at 114. Mr. DeWitt explained that his exhibits were originals, in black ink, and not substantively altered—in contrast to the photocopied and redacted versions the defense relied on. Doc. 230 at 14. Ms. Ottinger would have affirmed his testimony. As demonstrated by Mr. DeWitt's post-trial submission, she could have competently testified that Mr. DeWitt could not have traced the computer-generated FDC logo

on the Maddox Memorandum, Ms. Peterson signed the Peterson Memorandum, and Mr. DeWitt's version of the House Form was the original. Doc. 193-4 at 3-5.

Because Ms. Ottinger's testimony was critical to dismantling the defense's counterargument and Mr. DeWitt's late disclosure was not in bad faith, her absence prejudiced Mr. DeWitt's case. *Mawby v. United States*, 999 F.2d 1252, 1254 (8th Cir. 1993) (holding late-disclosed witnesses "should seldom be barred" absent "bad faith" (quotation marks omitted)). Given that the defense's forgery argument came only two and a half weeks before trial, and its specific arguments about certain documents arose only on the first day of trial, Mr. DeWitt did not have an opportunity to timely disclose an expert witness. It would be a miscarriage of justice to permit the defense to take advantage of trial's timing to artificially hinder Mr. DeWitt's case.

### D. The Peterson Memorandum and Yates Request Were Admissible.

The district court excluded as hearsay the Peterson Memorandum, Doc. 230 at 79, and Yates Request, Doc. 110 at 2. Both documents were admissible, and the district court plainly erred in holding otherwise. *See United States v. Madden*, 733 F.3d 1314, 1319 (11th Cir. 2013).

The Peterson Memorandum was an FDC business record, admissible under Federal Rule of Evidence 803(6). Correctional sentencing specialists like Ms. Peterson handle inmate requests. Doc. 231 at 64. Such documents are "kept in the course of regularly conducted activity" of Northwest, and "making the record was a regular practice," since Northwest is required to process incarcerated persons' requests. *United States v. Joseph*, 978 F.3d 1251, 1265 (11th Cir. 2020) (quoting Fed. R. Evid. 803(6)(A)-(C)). Because the district court had previously confirmed the Peterson Memorandum's authenticity, Doc. 180 at 3-5, it was therefore admissible at trial as a sufficiently reliable business record, *see United States v. Bueno-Sierra*, 99 F.3d 375, 378-79 (11th Cir. 1996). The district court reiterated its prior ruling as to the Peterson Memorandum at trial:

> As to authenticity, as I've said, it's a two-step process. I believe he's satisfied the prima facie showing that's what was handed to him, and it was a true and accurate copy of what's handed to him. That doesn't mean the jury has to believe him. It then becomes—as to authenticity, it then becomes a question of fact for the jury.

Doc. 230 at 75.

This conclusion was obvious from the face of the Peterson Memorandum and Mr. DeWitt's testimony. *Id.* at 73-74. But the district

court did not consider the business record exception when it sustained the defense's hearsay objection. *Id.* at 73. Because Ms. Peterson was deceased, the court discussed only Rule 804(b)(3)'s exception and concluded that the document was not admissible as a statement against interest. *Id.* at 77-78. The court, even after it concluded that the authenticity of the Peterson Memorandum is a question of fact for the jury, also improperly prevented Mr. DeWitt from introducing the document for notice purposes:

> Mr. Dewitt: Can I offer [the Peterson Memorandum] to not show the truth, but offer that I received it from her, but not show the truth of the matter?
>
> The Court: You've already told them you received a letter from her, and you can say that she met with you to discuss processing.

*Id.* at 79-80.[5] Mr. DeWitt was therefore only permitted to discuss that he received the Peterson Memorandum instead of being permitted to show and have the jury to determine the authenticity of the document. *Id.* at 80.

[5] The district court also advised Mr. DeWitt that he could not "say what she said," and he further advised Mr. DeWitt that he could say that he "met with her . . . to discuss processing my grievance." *Id.* at 80.

The district court's exclusion of the Yates Request on hearsay grounds was similarly wrong. *Madden*, 733 F.3d at 1319; *see* Docs. 90-1 at 45; 110 at 2; 114 at 5. The Yates Request was not hearsay because Mr. DeWitt sought to introduce it "to show its effect on" Warden Maddox. *United States v. Starr*, 159 F.4th 901, 909 (11th Cir. 2025); *see United States v. Elysee*, 993 F.3d 1309, 1338 (11th Cir. 2021) (the exclusion on hearsay grounds of documents offered for effect on the listener is error). As with the House Form, the Yates Request documented that Mr. DeWitt had reported threats made by incarcerated individuals against him at Northwest, those reports were in his file, and Warden Maddox was therefore aware of those threats. Doc. 90-1 at 45.

Even if the Yates Request was hearsay, like the Peterson Memorandum, it satisfied the business record exception. FDC had a regular practice of processing such requests after incarcerated people seek an administrative remedy or appeal, and those requests were kept in the course of FDC's regularly conducted activity. *See Joseph*, 978 F.3d at 1265.

The district court's failure to admit these documents was plain error, *see Madden*, 733 F.3d at 1319, and that error was "particularly

egregious" because it "seriously affect[ed] the fairness" of Mr. DeWitt's judicial proceeding, *United States v. Williford*, 764 F.2d 1493, 1502 (11th Cir. 1985). Warden Maddox repeatedly claimed he did not know the danger Mr. DeWitt faced. *See* Docs. 229 at 74; 231 at 115-16; 232 at 75. But the Peterson Memorandum and Yates Request refuted that claim. The Peterson Memorandum stated that Mr. DeWitt was recommended for a "one-person section during [his] forthcoming transfer." Doc. 187-5 at 1. And it confirmed that Ms. Peterson had "provided a copy of [Mr. DeWitt's] Informal Grievance . . . to Warden David Maddox on 04/04/18." *Id.*

Once Warden Maddox had Mr. DeWitt's Informal Grievance, a jury could find that it was incumbent upon him to review Mr. DeWitt's file, including the Yates Request, and verify the existence of such threats. The Yates Request showed that Northwest staff both heard and documented these threats throughout Mr. DeWitt's incarceration. These records directly demonstrated that Warden Maddox was in fact aware of and deliberately indifferent to Mr. DeWitt's fears when he refused to safely transfer Mr. DeWitt. The district court plainly erred by not admitting these documents.

Any one of these evidentiary errors merits a new trial, and this Court should vacate the district court's judgment and overturn the district court's judgment on costs.

## III. THE COURT MISHANDLED MR. DEWITT'S DISQUALIFICATION MOTION.

Judge Walker abused his discretion when he (1) denied Mr. DeWitt's disqualification motion without conducting an evidentiary hearing, and (2) engaged in independent investigations into Mr. DeWitt's allegations. *See* Docs. 119; 120; *see also McWhorter v. City of Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990).

### A. Mr. DeWitt Was Entitled to an Evidentiary Hearing.

Mr. DeWitt provided a sufficient showing that Judge Walker's "impartiality might reasonably be questioned" under 28 U.S.C. § 455(a) to warrant an evidentiary hearing. Mr. DeWitt sought Judge Walker's disqualification after he learned that Judge Walker previously presided over Mr. DeWitt's state criminal proceedings. Doc. 118 at 4-5. Mr. DeWitt explained that Judge Walker's prior knowledge of him may have contributed to "his unfair rulings . . . during the pretrial motion hearings." *Id.* at 5. And Mr. DeWitt pointed out that Judge Walker had previously admitted to "knowingly putting error on the record" when

adjudicating one of Mr. DeWitt's state cases: *State of Florida v. DeWitt*, No. 2007-CF-2697. Doc. 18 at 4.

Judge Walker erred when he denied Mr. DeWitt's motion without proper consideration. He should have provided Mr. DeWitt an evidentiary hearing to ascertain the facts of Mr. DeWitt's allegations and consider whether an objective observer would question his impartiality. *See* 28 U.S.C. § 455(a); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1523 (11th Cir. 1988) ("Inherent in § 455(a)'s requirement that a judge disqualify himself if his impartiality might reasonably be questioned is the principle that our system of 'justice must satisfy the appearance of justice.'" (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954))). A proper evaluation of Mr. DeWitt's disqualification motion required Judge Walker to consider not whether he knowingly held direct and demonstrable bias against Mr. DeWitt, but whether "'his impartiality might reasonably be questioned' by other persons." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859 (1988) ("Scienter is not an element of a violation of § 455(a)."). That Judge Walker evaluated only whether he had personal knowledge of Mr. DeWitt was error.

Judge Walker denied Mr. DeWitt's assertion of partiality by stating that he "ha[d] no memory" of presiding over Mr. DeWitt's state criminal cases. Doc. 119 at 4. Presiding over a previous case involving a party "does not mandate recusal from all future litigation involving" that party, *id.* (quoting *Christo v. Padgett*, 223 F.3d 1324, 1334 (11th Cir. 2000)), but it does not defeat a claim for disqualification. A judge's conduct in those prior matters may be crucial for determining whether—under an objective view—personal bias may be established. Similarly, while a party's pointing to an erroneous ruling from a past proceeding may not, in and of itself, establish disqualification, *see id.* (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)), it may nevertheless contribute to a showing of bias.

Although Judge Walker stated that he "ha[d] no personal knowledge of the facts of [Mr. DeWitt's] case," Doc. 119 at 2, he had previously presided over another of Mr. DeWitt's civil federal cases, *see* Docket Report, *DeWitt v. Florida*, No. 4:15-cv-00433 (N.D. Fla. Sep. 3, 2015). During that earlier case, Mr. DeWitt submitted a letter to the court, asking for an order requiring the FDC to place him into protective

management. *See* Letter of Steven R. DeWitt, ECF No. 45, *DeWitt v. Florida*, No. 4:15-cv-00433 (N.D. Fla. Aug. 17, 2017).

Mr. DeWitt's request included a lengthy description of threats and harms he received prior to the April 5, 2018 assault during transfer. *See id.* at 1-3. These included a July 19, 2017 assault, where Mr. DeWitt "sustained multiple injuries"; Mr. DeWitt's prior transfer from Liberty to Northwest, accompanied by fifteen gang members; and Mr. DeWitt's request for protective management at Northwest. *See id.* at 1-2. Mr. DeWitt also shared that Officer Yates told Mr. DeWitt he would be getting a "roommate." *See id.* at 3. That roommate turned out to be an individual who had previously threatened Mr. DeWitt's life. *Id.* When Mr. DeWitt raised his concerns, FDC officials said their hands were tied, causing Mr. DeWitt to request placement in the mental health holding cell to separate himself from the assigned roommate. *See id.*

Mr. DeWitt's request gave Judge Walker knowledge of specific FDC officials—including Officer Yates—who were relevant to the current case. Mr. DeWitt's letter conveyed the importance of Officer Yates' testimony to the harms he ultimately suffered at Northwest. Judge Walker also sent a copy of Mr. DeWitt's letter to the FDC Inspector General. Judge

Walker's statement that he "ha[d] no personal knowledge of the facts of [Mr. DeWitt's] case" was contradicted by Mr. DeWitt's letter. Doc. 119 at 2. And his prior knowledge could have influenced his decision making in Mr. DeWitt's case against Warden Maddox.

Mr. DeWitt made a prima facie showing of bias that should have been resolved at an evidentiary hearing. Doc. 118 at 4. Mr. DeWitt deserved a chance to establish his claim, and Judge Walker abused his discretion by denying Mr. DeWitt that opportunity. *See, e.g.*, *Norris v. United States*, 820 F.3d 1261, 1266 (11th Cir. 2016) (remanding for the district court to hold an evidentiary hearing and consider "whether there [wa]s an intolerable probability" that the judge could not "hold the balance nice, clear and true" (citation and quotation marks omitted)).

### B. Judge Walker Abused His Discretion When He Conducted Independent Investigations into Mr. DeWitt's Case.

Judges are required to disqualify themselves when they have "personal knowledge of disputed evidentiary facts concerning [a] proceeding." 28 U.S.C. § 455(b)(1). The American Bar Association Model Code of Judicial Conduct Rule 2.9(C) supplements that "[a] judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially

noticed." Following his denial of Mr. DeWitt's disqualification motion, Judge Walker conducted independent research and sua sponte issued a clarification order. *See* Doc. 120. He stated, "This Court has searched the state court's records database and identified three of Defendant's criminal cases in Leon County to which the undersigned judge was assigned." *Id.* at 1. Judge Walker's investigation was improper because it exceeded the scope of his judicial role.

Judge Walker's independent investigation biased him against Mr. DeWitt, as demonstrated by his use of the word "Defendant" to refer to Mr. DeWitt throughout his clarification order. *See, e.g.*, Doc. 120 at 1-2. Judge Walker's use of "Defendant" was telling. Mr. DeWitt was not the "Defendant" before Judge Walker in this case. He was the plaintiff. Judge Walker's labeling of Mr. DeWitt as the defendant created at minimum an appearance of "personal bias" because rather than treating Mr. DeWitt as an aggrieved plaintiff seeking justice, Judge Walker dismissed him as a repeat criminal offender. 28 U.S.C. § 455(b)(1); *cf. United States v. Carey*, 929 F.3d 1092, 1106 (9th Cir. 2019) (admonishing a magistrate judge for "referencing or considering facts not properly admitted into evidence").

Judge Walker demonstrated both "a personal knowledge of disputed evidentiary facts," 28 U.S.C. § 455(b)(1), and violated norms restricting judges from "investigat[ing] facts in a matter independently," Am. Bar Ass'n Model Code of Jud. Conduct R. 2.9(C). His conduct was improper.

## CONCLUSION

The district court erred in failing to appoint counsel, and this Court should reverse and remand for a new trial with instructions to appoint counsel. This Court should also reverse and remand based on the district court's flawed evidentiary determinations and because it should have recused itself. Should this Court find in Mr. DeWitt's favor on any of these issues, it should also overturn the district court's order on costs.

Respectfully Submitted,

*/s/ Erica Hashimoto*

Erica Hashimoto
*Director*
GEORGETOWN UNIVERSITY LAW CENTER
APPELLATE LITIGATION PROGRAM
111 F Street NW, Suite 306
Washington, D.C. 20001
(202) 662-9555
eh502@georgetown.edu
*Counsel for Appellant*

Dated: Mar. 2, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,811 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). It complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in 14-point Century Schoolbook font in the Microsoft Word software.

*/s/ Erica Hashimoto*
Erica Hashimoto
Georgetown University Law Center
Appellate Litigation Program

Dated: Mar. 2, 2026

## CERTIFICATE OF SERVICE

I, Erica Hashimoto, certify that on March 2, 2026, I electronically filed the foregoing Opening Brief of Appellant Steven R. DeWitt via this Court's CM/ECF system, which will send notice of such filing to counsel of record in the above-captioned case.

*/s/ Erica Hashimoto*
Erica Hashimoto
Georgetown University Law Center
Appellate Litigation Program

Dated: Mar. 2, 2026